**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA,** | **No. 4:25-cv-03163 (M)** |
| *Plaintiff*, | **No. 4:25-cv-3089 (L)** |
| v. | |
| **MIKE HILGERS, in his official capacity as Attorney General of Nebraska,** | **PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| *Defendant*. | |

## INTRODUCTION

Plaintiff Pharmaceutical Research and Manufacturers of America ("PhRMA") has sufficiently pled its claims. PhRMA adequately pled that L.B. 168, which purports to graft *state law* requirements onto a *federal* Spending Power program, 42 U.S.C. § 256b ("340B"), and wrest control away from the federal government, violates the U.S. Constitution's Supremacy Clause and its prohibition on extraterritorial regulation. *See Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439 (S.D. W. Va. 2024) (concluding similar state law was likely preempted).

"Through Medicare and Medicaid, [the federal government] pays for almost half the annual nationwide spending on prescription drugs." *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023). The federal government thus has extraordinary leverage to use the promise of federal funding under those programs to induce drug manufacturers to agree to obligations it could not impose on them directly. And Congress uses that market power to enlist drug makers "to subsidize healthcare." *Id.* In particular, as a condition of reimbursement under Medicare Part B and Medicaid, Congress requires drug manufacturers to sign a federal agreement to offer certain drugs at "strikingly low" prices, often "pennies per unit," to fifteen enumerated types of healthcare

1

providers ("covered entities"), which then resell those drugs to their patients at higher prices. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 455-58 (D.C. Cir. 2024) (describing the federal "340B" program, 42 U.S.C. § 256b). In this way, the federal government engages private businesses—drug manufacturers—to deliver 340B's unique form of federal subsidy.

That is not something Congress can simply mandate; instead it uses its Spending Power to enlist drug manufacturers to agree to offer this reduced pricing to targeted healthcare providers. In any other context, a law (federal or state) that simply compelled private parties to sell their property at confiscatory prices would raise serious constitutional concerns. But "Congress may 'regulate where it otherwise could not'—beyond its enumerated powers, in other words—by imposing conditions on federal funds," provided the recipients "consent to the bargain." *Ali v. Adamson*, 132 F.4th 924, 930-31 (6th Cir. 2025); *see also, e.g.*, *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545 (1983). And that is precisely what Congress has done by making participation in the 340B program one of the "condition[s] of participating in Medicare Part B and Medicaid," *Novartis*, 102 F.4th at 455, that "define the limits of th[os]e government spending program[s]," *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). As a result, the obligations imposed on manufacturers via participation in 340B must be imposed "*unambiguously*" by Congress. *E.g.*, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219-20 (2022) (recipient of federal funds must not only know "what rules it must follow" but "also what sort of penalties might be on the table"); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (question is whether the legislation "furnishes clear notice").

L.B. 168 is not a law of general applicability; it is targeted *only* at the federal 340B Spending Power program and *only* at drug manufacturers who sign the federal agreement and opt into that program. 42 U.S.C. § 256b(a)(1); L.B. 168 §§ 2(1), (2) (defining "340B drug" and "340B

entity" with reference to the federal program). Nebraska's intent is transparent: It is attempting to impose new obligations on drug manufacturers participating in the 340B program by mandating that manufacturers provide federal 340B price reductions (the federally-mandated, privately-funded subsidies) in a range of circumstances where federal law and manufacturers' federal contracts under 340B do not require them to do so. *See infra* at 16-17, 19-27. Even worse, Nebraska purports to impose obligations that federal courts have repeatedly held cannot be imposed by the federal agency, the U.S. Department of Health and Human Services ("HHS"), charged with overseeing the 340B program. Indeed, by expanding the scope of the federal program that HHS must oversee, Nebraska seeks to saddle HHS *itself* with additional burdens that Congress deemed too onerous.

Under the Supremacy Clause of the U.S. Constitution, federal law supplants state law. The federal government has a unique and heightened interest in the uniform and exclusive administration of its Spending Power programs and its federal agreements with manufacturers. And states cannot interfere with those federal government agreements in a way that impairs a federal function. *CoreCivic v. Governor of New Jersey*, 145 F.4th 315, 321-23 (3d Cir. 2025) (collecting cases on intergovernmental immunity). Nebraska thus does not have the power to modify 340B at all, let alone to inject new undisclosed obligations altering the bargain drug manufacturers made when they signed the federal 340B agreement or to saddle HHS with obligations that Congress chose not to impose. L.B. 168 is invalid for that reason alone.

Defendant's motion to dismiss is the same motion it filed in a different case, No. 25-cv-3089, brought by a differently situated plaintiff (AbbVie) that presented different arguments. Perhaps it is not surprising then that the State fails to meaningfully address material issues *in this case*, including how the federal and state programs overlap and address the same key topic—

3

delivery of federal 340B-priced drugs to contract pharmacies. At least three unique features of the federal 340B program demonstrate how Nebraska's law, L.B. 168, unlawfully adds significant new obligations on drug manufacturers to this federal Spending Power program and to the drug manufacturers' federal agreements, and why L.B. 168 is preempted under more traditional field- and conflict-preemption principles as well.

First, in Section (a)(1) of the 340B statute, Congress required that manufacturers "offer" 340B drugs at reduced federal prices to the specified beneficiaries of the 340B federal subsidy— the "covered entities." 42 U.S.C. § 256b(a)(1). Multiple federal courts have addressed specific "reasonable" conditions that are appropriate in a manufacturer's "bona fide" federal "offer." *Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 703-06. If a manufacturer makes a "bona fide" offer to sell and deliver 340B-priced drugs and a covered entity rejects that offer, there is no manufacturer obligation to sell at a 340B price; a manufacturer's federal duty to make a 340B offer has been satisfied; its obligation to offer has been discharged. *See Novartis*, 102 F.4th at 460-64. But L.B. 168 would outlaw these federally permissible conditions on federal offers under Section (a)(1)—including reasonable delivery conditions relating to "contract pharmacies" *already approved by federal courts*, as well as a recently launched federal "pilot program" to administer 340B price reductions through rebates. *See infra* at 19-23, 27-31. By outlawing federally permissible conditions for sale and delivery of 340B drugs (including the one-contract-pharmacy condition), L.B. 168 seeks to compel federal 340B-priced sales that would not occur under federal law. L.B. 168 § 3(1); *Novartis*, 102 F.4th at 462-64. Again, this fundamentally alters the 340B program's bargain—struck via Congress's Spending Power and implemented by federal agreement—between manufacturers and the federal government.

Second, as to claims-data policies specifically, PhRMA's Complaint describes why it is

4

necessary to obtain key data about the subject prescriptions.  Compl. ¶¶ 133-40.  "Claims data" is data about the specific prescriptions that may or may not qualify for 340B pricing under federal law.  Such data is "readily available" to healthcare providers, widely utilized in healthcare billing, and minimally burdensome to provide.[1]  Claims data is also essential for manufacturers to invoke the federal statutory remedies process under the federal 340B program.  *See infra* at 27-31.  And a federal court has held that manufacturers can lawfully mandate the sharing of claims data as a precondition to providing 340B pricing on sales involving "contract pharmacies."  *Novartis*, 102 F.4th at 462-64.  Yet L.B. 168 seeks to hide this key data from manufacturers by prohibiting them from requiring it as a precondition for providing 340B pricing.  L.B. 168 § 3(2).  That not only frustrates the operation of remedial rights Congress expressly made available to manufacturers under the 340B program, but also expands the obligations of HHS, the agency that oversees the program.  That agency already must police covered entities' relationships with contract pharmacies and patients, and will now have to police a greater universe of transactions.  This also directly interferes with the federal 340B program.  *See Morrisey*, 760 F. Supp. 3d at 450-53; Compl. ¶¶ 133-40.

Third, L.B. 168 conflicts with 340B's exclusive federal administration and enforcement regime.  *See Morrisey*, 760 F. Supp. 3d at 453-61 (concluding that a similar state 340B law conflicts with the exclusive administration and enforcement regime established by Congress).  As the Supreme Court made clear in *Astra USA, Inc. v. Santa Clara County*, Congress intended that the 340B program would be administered exclusively by HHS, on a "uniform nationwide basis,"

---

[1] Rebate Model Pilot Program, 90 Fed. Reg. 36,163, 36,165 (Aug. 1, 2025) (referring to claims data as "readily available"); *Novartis*, 102 F.4th at 463 (discussing that the "burden of providing the claims data is 'minimal.'"); *Morrisey*, 760 F. Supp. 3d at 451 (noting that use of claims data is "widespread").

with enforcement "centralized" in the federal government. 563 U.S. 110, 119-22 (2011). Congress created a series of unique and exclusive federal remedy provisions governing 340B. *Id.*; *see* 42 U.S.C. § 256b(d). The Supreme Court warned specifically that splitting the enforcement burden among multiple decisionmakers would risk "conflicting adjudications," endangering the program. *Astra*, 563 U.S. at 120. L.B. 168 empowers state decisionmakers to address *the same conduct* already covered by the federal program's remedial measures. Compl. ¶ 123; *e.g.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("[C]onflict is imminent whenever two separate remedies are brought to bear on the same activity."). These state enforcement measures directly conflict with HHS's exclusive authority and present the precise risk of conflicting adjudications *Astra* identified. 563 U.S. at 119-22. If not invalidated, L.B. 168, along with similar laws in dozens of other states, will prevent the federal agency from managing the 340B program on a uniform nationwide basis. And with conflicting requirements from dozens of decisionmakers in different states, the 340B program will no longer be uniform or federal.

Nebraska cannot genuinely argue that these issues were resolved by the Eighth Circuit's decision in *Pharmaceutical Research & Manufacturers of America v. McClain*, 95 F.4th 1136 (8th Cir. 2024). *McClain* predated *Novartis* and did not address the very specific and irreconcilable conflicts with L.B. 168 raised in this case, including (1) PhRMA members' federally-permissible one-contract-pharmacy and claims-data conditions on their "offers" under 42 U.S.C. § 256b(a)(1); and (2) the federal agency's recent Rebate Model Pilot Program. *See infra* at 23-25.[2]

Nor did *McClain* address PhRMA's dormant Commerce Clause claim, which PhRMA also sufficiently pled. As the Complaint explains, almost all manufacturer transactions occur

---

[2] Likewise, *McClain* did not substantively address the Supreme Court's unanimous *Astra* decision, 563 U.S. at 119-20, or evidence that contract pharmacies are violating federal anti-diversion guidance on "agency" and "title." *See infra* at 23-25, 34-36.

*extraterritorially*, outside Nebraska, between out-of-state manufacturers and out-of-state distributors, which in turn handle sales of drugs to covered entities and pharmacies, some of which are located in Nebraska. Compl. ¶¶ 158-67. As the Eighth Circuit recently held, *Association for Accessible Medicines v. Ellison*, 140 F.4th 957, 960 (8th Cir. 2025), *reh'g denied,* No. 24-1019, 2025 WL 2178535 (8th Cir. Aug. 1, 2025), laws that directly regulate out-of-state transactions and pricing are unconstitutional. L.B. 168 is just such a law: L.B. 168 regulates wholly out-of-state transactions between out-of-state manufacturers, on the one hand, and out-of-state distributors, on the other, requiring manufacturers to sell their drugs at penny prices. *See infra* at 36-38. That is impermissible.

Defendant's motion to dismiss should be denied.

## BACKGROUND

### A.    The Federal 340B Drug Pricing Program

      1.    <u>Congress Creates Comprehensive Law But Contract Pharmacies Barge In</u>

In order to receive federal Medicaid or Medicare reimbursements, manufacturers must sign the federal 340B agreement and opt into that program. 42 U.S.C. §§ 256b(a)(1), 1396r-8(a)(1). The federal statute and federal agreement require that the manufacturer "shall offer" 340B-reduced-price drugs to a statutory list of 15 types of healthcare providers ("covered entities"). *Id.* §§ 256b(a)(1), (4); Compl. ¶¶ 39-43. That is not something Congress or an agency (or a state) could require without a manufacturer's opt-in without raising serious constitutional concerns. *See, e.g.*, U.S. Const. amends. V, XIV. And because manufacturer participation in Medicare and Medicaid and 340B rise and fall together, Congress needed to ensure that the benefits of participation in Medicare and Medicaid outweigh the burdens of 340B participation. That is why Congress narrowly circumscribed the universe of entities eligible to insist on reduced prices. And, as relevant here, no pharmacies of any kind appear on that statutory list. 42 U.S.C. § 256b(a)(4);

*Novartis*, 102 F.4th at 462; *Sanofi*, 58 F.4th at 703.

In addition to limiting the universe of covered entities, Congress also tried to ensure that HHS would police the inevitable temptation for entities like pharmacies to try to get the benefits of 340B pricing. To that end, in 42 U.S.C. § 256b(a)(5) (known as the "diversion" provision), Congress outlawed any effort by a covered entity to resell or transfer a 340B-priced drug to any person other than a "patient" of that entity. In 1996, HHS addressed whether a covered entity *without* an in-house pharmacy could contract with one—but only one—outside pharmacy to dispense 340B-priced drugs to its patients. The agency reasoned that, if such a pharmacy was contractually an "agent" of the covered entity (a "contract pharmacy"), and the entity retained title to the drugs at all times before they were dispensed to its patients, then such an arrangement would not violate the diversion provision. 61 Fed. Reg. 43,549, 43,550, 43,555 (Aug. 23, 1996). Concerned about the risk of diversion, however, HHS permitted each covered entity to have a maximum of *one* contract pharmacy. *Id.* at 43,555.

These requirements applied for 14 years, until the agency "swerved" and changed its guidance, allowing an *unlimited* number of contract pharmacies for each covered entity. *Novartis*, 102 F.4th at 457-58 (explaining this history and problems that developed after 2010); Compl. ¶ 62.

Thereafter, the number of contract pharmacies exploded, as (predictably) did the number of claims for 340B pricing—meaning that the cost to manufacturers skyrocketed, even though the patient population of covered entities eligible for 340B pricing did not expand at anything approaching the same rate. *Novartis*, 102 F.4th at 457-58; *see also* Compl. ¶ 62. As the Government Accountability Office ("GAO") and the HHS Inspector General ("OIG") have since explained, many for-profit pharmacies—including the nation's largest chains—recognized that if they could insert themselves into 340B, they could acquire drugs at 340B prices, sell them at or

8

near full price, and pocket a portion as profit.  *Novartis*, 102 F.4th at 456-58.

This explosion ballooned 340B's size and dramatically increased the risk of abuse.  Compl. ¶ 62.  The opportunity for abuse is even more acute given most contract pharmacies' use of the product "replenishment model."  *Id.* ¶¶ 65-72.  Although HHS directed that covered entities should retain title to 340B-priced drugs and require contract pharmacies to operate as their agents, 61 Fed. Reg. at 43,550, 43,553-54, the product replenishment model jettisons these limitations.  Using this model, contract pharmacies dispense drugs from their general inventories to all customers.  Compl. ¶¶ 65-72.  On the back end, contract pharmacies use undisclosed algorithms to purport to retroactively identify customers that may have some relationship to a covered entity and restock their general inventories with 340B-priced drugs based on the outcome.  *Id.* ¶¶ 66-68; *Morrisey*, 760 F. Supp. 3d at 447-48.

Unfortunately, these price reductions are not passed onto patients because drugs come out of a pharmacy's general inventory and 340B pricing is not applied until after patients depart. Compl. ¶¶ 71-75; *Morrisey*, 760 F. Supp. 3d at 447.

### 2.    Manufacturers Attempt To Curb Abuse

Eventually, drug manufacturers concerned with diversion and illegal duplicate discounts associated with contract pharmacies individually implemented their own policies meant to identify and address these problems, including (A) limits on the number of contract pharmacies used and (B) requirements that claims data be provided.  Compl. ¶¶ 85-93; *Novartis*, 102 F.4th at 457-58. In 2021, HHS intervened, issuing a series of notices of violation to drug manufacturers seeking to compel them to offer and deliver 340B-priced drugs to *all* of the tens of thousands of contract pharmacies of covered entities nationwide.  Compl. ¶¶ 95-97.

Litigation followed, with key decisions in courts of appeals for the Third Circuit and the D.C. Circuit.  *Id.*  The central legal question in each of these cases was whether the federal

government could mandate an "unlimited" contract pharmacy delivery requirement consistent with the authority Congress supplied it in the federal statute. The answer in both Circuit cases was "no."

First, in *Sanofi*, the Third Circuit explained that Congress contemplated "one-to-one" relationships between manufacturers and covered entities in the 340B program, "without mixing in a plethora of pharmacies." 58 F.4th at 704-05. No language in the federal statute addressed delivery to contract pharmacies—the statute is silent on that topic—and an unlimited contract pharmacy mandate could not be justified based on statutory text or structure. *Id.* at 703-06. But *Sanofi* recognized that a federal contract pharmacy delivery mandate might be appropriate on a much smaller scale—for example, when a covered entity did not have any in-house pharmacy and thus could not "accept" a drug manufacturer's 340B offer without having ***one*** contract pharmacy to dispense the drugs. *Id.* Such a delivery requirement might be implemented under the agency's authority in Section (a)(1) to require bona fide federal offers. *Id.* Accordingly, *Sanofi* indicates that the issue of delivery to a contract pharmacy does fall within the realm of HHS's authority (and outside of regulation by a state); HHS just cannot mandate delivery to contract pharmacies beyond that necessary to ensure a 340B offer remains bona fide.

In *Novartis*, the D.C. Circuit went a step further. It first agreed with *Sanofi* that the 340B statutory text could not support the federal agency's *unlimited* contract pharmacy mandate. 102 F.4th at 460-64. Again, Congress had not identified contract pharmacies or delivery to those pharmacies in the statute. But HHS also specifically asked the court to answer a separate question under 42 U.S.C. § 256b(a)(1) of the federal statute: Could the manufacturers lawfully condition their federal offers on a "one contract pharmacy" delivery limitation, and "claims data" precondition? *Novartis*, 102 F.4th at 460-64.

*Novartis* clarified the law by answering that question in Sections 4 and 5 of its opinion. *Id.* at 463-64. Congress left manufacturers a degree of discretion to structure their 340B offers under 42 U.S.C. § 256b(a)(1), but such offers must still be "bona fide," reasonable, and consistent with the federal statute. *Id.* at 462-63; Compl. ¶¶ 96-105. The court then held that the two conditions at issue—a "one contract pharmacy" limitation and a requirement to provide "claims data"—met that test. *Novartis*, 102 F.4th at 460-64. In other words, the manufacturer could offer to sell at 340B prices and deliver only to the covered entity or one contract pharmacy of the entity's choice. *Id.* As the court explained, HHS itself had enforced a one-contract-pharmacy limit for more than a decade. *Id.* at 461. Likewise, a manufacturer may condition its offer to sell at 340B prices on the covered entity providing "claims data"—information about the prescriptions at issue. *Id.* at 463. Claims data not only is readily accessible from pharmacies, widely used within the health care industry, and can be provided with minimal burden, but is key to the operation of the federal enforcement regime. *See infra* at 28-30.

Thus, a manufacturer is permitted to make a 340B offer with either of these two contractual conditions. An offer with these conditions satisfies a drug manufacturer's duty to make a bona fide offer under Section (a)(1) of the federal statute and its federal agreement. Once such an offer is made, the manufacturer's "shall offer" obligations are discharged. *Novartis*, 102 F.4th at 460-64. If such an offer is not accepted by a covered entity, there is no sale of a 340B-priced drug. *See id.*; Compl. ¶¶ 86-93.

### 3.    Supreme Court Concludes That Federal Enforcement Scheme Is Exclusive

At the time Congress was amending the 340B statute in 2010, litigation between drug manufacturers and covered entities owned by Santa Clara County was underway. *Astra*, 563 U.S. at 116-17. In its amendments, Congress created a new comprehensive remedies process, *see* 42 U.S.C. § 256b(d), with a number of unique features. The process was intended to be the proper

and exclusive remedy for such disputes, and was required to be iterative, with informal dispute resolution, corrective actions, audits, adjustments and refunds all preceding any assessment of civil penalties. *Id.* § 256b(d)(1)(B)(v)-(vi); *Astra*, 563 U.S. at 121-22.  And any issues raised by covered entities or drug manufacturers would be resolved through Section (d)(3)'s Administrative Dispute Resolution ("ADR") process.  42 U.S.C. § 256b(d)(3)(A).  As the federal statute explains, agency decisions on these issues are final, subject only to federal court review.  *See id.* § 256b(d)(3)(C).

The federal government has described these federal processes as the exclusive remedies for *any disputes regarding contract pharmacies* and has structured its regulations to address such claims.  42 C.F.R. § 10.21(a)(1); Gov. Reply Br. at 5, *Am. Hosp. Ass'n v. HHS*, No. 4:20-cv-08806 (N.D. Cal. Feb. 1, 2021), ECF No. 82 ("Gov. Reply Br.").  Indeed, covered entities have brought multiple ADR claims about delivery to contract pharmacies and manufacturers' one-contract-pharmacy policies before HHS.  Compl. ¶ 107.

### B.    Nebraska Legislative Bill 168

L.B. 168 expressly regulates participation in the federal 340B program; indeed, L.B. 168 has no effect unless a manufacturer participates in 340B.  *See* L.B. 168 §§ 2(1), (2) (defining "340B drug" and "340B entity" with reference to the federal program).  L.B. 168 seeks to regulate and change the federal program in two specific ways:  (1) it alters the terms of the federal 340B offer manufacturers must make under Section (a)(1) of the federal statute; and (2) it compels drug manufacturers to enter certain transactions to sell 340B-priced drugs even when federal law does not require those sales.  L.B. 168 §3(1)-(2).  L.B. 168 thus directly expands the amount of 340B federally-mandated, privately-funded subsidies for Nebraska businesses.

L.B. 168 includes two key paragraphs.  The first bars manufacturers from imposing limits on providing 340B-priced drugs to contract pharmacies:  A manufacturer "shall not, either directly or indirectly, deny, restrict, or prohibit the acquisition of any 340B drug by or delivery of any 340B

drug to any location authorized by any 340B entity to receive such 340B drug, unless receipt of such 340B drug is prohibited by federal law." *Id.* § 3(1). The second bars manufacturers from requiring submission of claims data: A manufacturer "shall not, either directly or indirectly, require any 340B entity to submit any data, including any claim data, utilization data, encounter data, medical data, purchasing data, or other data, as a condition for allowing the acquisition of any 340B drug by or delivery of any 340B drug to any 340B entity or to any location authorized by any 340B entity to receive such 340B drug, unless such data is required by federal law." *Id.* § 3(2). That is, it requires manufacturers to sell drugs to covered entities (and contract pharmacies) at 340B prices even when the covered entity refuses to comply with the manufacturer's conditions regarding the number of contract pharmacies or the provision of claims data—the very same conditions courts have held Congress permitted manufacturers to impose on covered entities as part of a "bona fide" offer. *Novartis*, 102 F.4th at 460-64; *Sanofi*, 58 F.4th at 703-06.

The only difference between a 340B drug and a non-340B drug is its price; they are otherwise identical in every respect. L.B. 168 is not about drug *access.* This is undisputed. PhRMA members already sell and ship their drugs to the same pharmacies at commercial or negotiated prices. Compl. ¶ 90. By defining "340B drug" in reference to the federal pricing obligation, L.B. 168 requires manufacturers to extend deeply reduced *prices* on their drugs far beyond 340B's requirements—and punishes manufacturers based on the prices charged where Nebraska (but not Congress) thinks they should. *See* L.B. 168 § 2(1). L.B. 168 thus imposes additional, costly conditions on receipt of federal funding under Medicare and Medicaid above and beyond what Congress imposed pursuant to its Spending Power. And it imposes additional, obligations on HHS as well, as it forces HHS to police potential diversion by covered entities through tens of thousands of pharmacies that are not entitled to 340B pricing under federal law.

13

On top of that, L.B. 168 permits Nebraska to seek to enjoin manufacturers in state court from engaging in conduct wholly lawful under the federal statute and to commence an action for "other processes." *Id.* § 4.

## ARGUMENT

On a motion to dismiss, the Court "accept[s] the complaint's factual allegations as true and view[s] them in the light most favorable to the plaintiff," drawing all reasonable inferences in a plaintiff's favor. *Rinne v. Camden Cnty.*, 65 F.4th 378, 383 (8th Cir. 2023); *L.L. Nelson Enters., Inc. v. Cnty. of St. Louis*, 673 F.3d 799, 804 (8th Cir. 2012). "[S]pecific facts are not necessary." *United States v. $579,475.00 in U.S. Currency*, 917 F.3d 1047, 1049 (8th Cir. 2019).

## I.    NEBRASKA CANNOT REGULATE A FEDERAL PROGRAM ENACTED VIA FEDERAL SPENDING POWER

Although the ins and outs of the 340B program are complicated, the basic defect with Nebraska's law is simple:  States cannot modify, add to, or interfere with a federal program, enacted pursuant to Congress's Spending Power, unless Congress unambiguously authorizes states to make such changes—and Congress has not granted states any such authority here.  Defendant fails to show otherwise in his Motion.

The Supreme Court has long and consistently rejected state efforts to regulate a program or relationship that "originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001); *see also, e.g.*, *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-13 (1988) (holding that state tort law cannot be used to hold federal contractors liable for design defects in contracted-for military equipment).  That describes the 340B program to a T:  It is created entirely by federal statute, *see* Pub. L. No. 102-585, § 602, 106 Stat. 4,943, 4,967 (1992); Pub. L. No. 111-148, §§ 7101-02, 124 Stat. 119, 821-27 (2010) (both codified at 42 U.S.C. § 256b); it is governed only by federal law and administered

exclusively by a federal agency, *see Astra*, 563 U.S. at 119-20; and federal law exclusively dictates who must participate in the program and when, *see* 42 U.S.C. §§ 1396r-8(a)(1), § 256b(a)(1).

To be sure, states may require private parties that participate in federal programs to continue to comply with generally applicable state laws (at least so long as they do not conflict with parties' federal-law obligations). But states do not traditionally have the power to directly regulate the federal program or relationship itself. *See, e.g.*, *Buckman*, 531 U.S. at 348 (holding state-law claims for fraud on a federal agency preempted). For that reason alone, "no presumption against pre-emption obtains in this" context. *Id.* at 347. Quite the opposite: In cases like this one where a state has directly targeted a federal Spending Power program, "conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption," because the uniquely federal interest in "obligations to and rights of the United States" "changes what would otherwise be a conflict that cannot produce pre-emption into one that can." *Boyle*, 487 U.S. at 504, 507-08.

This time-tested approach to evaluating state laws that directly target federal programs makes sense, given that states lack authority in our constitutional system to single out for special regulation "the United States or those with whom it deals." *South Carolina v. Baker*, 485 U.S. 505, 523 (1988). Consistent with that principle, the Supreme Court has held time and again that states may not "control" federal operations by regulating those that contract with the federal government to advance federal objectives. *See Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738, 786-89, 866-67 (1824); *Crandall v. Nevada*, 73 U.S. (6 Wall.) 35, 44-45 (1867); *Okla. Tax Comm'n v. Tex. Co.*, 336 U.S. 342, 364 (1949). Such discrimination occurs where a state law "singles" out those contracted with the federal government "for less favorable treatment" or "regulates them unfavorably on basis related to their governmental status." *United States v. Washington*, 596 U.S. 832, 838 (2022). Yet that is exactly what Nebraska does here. Under

established principles of intergovernmental immunity, a state cannot directly regulate the activities of the federal government, nor impose obligations specific to those contracted with the federal government, unless Congress has "clearly and unambiguously authorized it." *E.g.*, *CoreCivic*, 145 F.4th at 321 (quoting *Washington*, 596 U.S. at 840). And, here, no one could seriously argue that Congress has "clearly and unambiguously authorized" states to add on their own requirements to the 340B program.

Those bedrock principles suffice to resolve this case. With L.B. 168, Nebraska seeks to barge into the federal 340B program and federal 340B contract, impose significant new obligations on drug manufacturers that change the federal bargain, and impose substantial additional burdens on HHS to boot. Specifically, Sections 3(1) and 3(2) impose significant obligations not found in the 340B federal statute or the federal agreements. Those provisions explicitly provide that manufacturers' 340B offers violate state law if they "deny, restrict, or prohibit the acquisition of any 340B drug by or delivery of any 340B drug to any location" or require "claim data" as a precondition to providing 340B pricing. L.B. 168 §§ 3(1)-(2). These new state-law obligations are directly at odds with the federal program that Congress established, which permits exactly the kind of one-contract-pharmacy and claims-data conditions that Nebraska forbids. *Compare id.*, *with Novartis*, 102 F.4th at 460-64 (concluding that one-contract-pharmacy policies and claims-data conditions were reasonable conditions on federal offers). Indeed, these state provisions purport to prohibit the federal agency's current "pilot program" utilizing 340B rebates and claims-data preconditions. *See* 90 Fed. Reg. at 36,163-65; Compl. ¶¶ 111-12.

Simply put, L.B. 168 is an unlawful effort to regulate, and impose new conditions, on Congress's 340B Spending Power program. It interjects new conditions into manufacturers' contracts with the federal government, making them take on obligations that Congress did not

require simply because they participate in a federal spending program. And by simultaneously adding all manner of contract pharmacies to the system through which diversion may occur, Nebraska's law saddles HHS with policing obligations that Congress itself chose not to impose. Nebraska cannot single out those contracted with the federal government for special obligations that do not apply to those who do not participate in federal programs, let alone impose its own obligations on federal agencies. L.B. 168 is invalid for that reason alone. Defendant's arguments do not, and cannot, disrupt this conclusion.

## II.    L.B. 168 IS CONFLICT PREEMPTED

PhRMA also sufficiently pled that L.B. 168 is preempted under ordinary conflict-preemption principles. State law is conflict preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Crosby*, 530 U.S. at 373, or "interferes with the methods by which the federal statute was designed to" achieve those purposes and objectives. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987) (state law preempted because it would "upset[] the balance of public and private interests so carefully addressed by the [federal statute]"); *see also Forest Park II v. Hadley*, 336 F.3d 724, 733 (8th Cir. 2003).

Moreover, in a Spending Power context like this one, the presumption against preemption is inverted, because the "obligations to and rights of the United States under its contracts are governed exclusively by federal law." *Boyle*, 487 U.S. at 504.

At bottom, states may not upset the bargained-for consideration of a federal contract and rewrite private parties' contracts with the federal government. *See id.* Indeed, even for laws of general applicability (unlike Nebraska's law), the threshold for preemption is low in this context—and is met when "the federal interest requires a uniform rule," such that the "entire body of state law applicable to the area conflicts and is replaced by federal rules." *Id.* at 508. So, state law

gives way to federal law where, as here, Congress has prescribed a uniform national rule through its Spending Power: "[F]ederal programs that by their nature are and must be uniform in character throughout the Nation necessitate formulation of controlling federal rules." *United States v. Kimbell Foods*, 440 U.S. 715, 728 (1979).

>   **A.    L.B. 168 Conflicts With Congress's Offer-and-Acceptance Mechanism And Impermissibly Expands The Scope Of The Federal 340B Subsidy**

L.B. 168 is preempted. It operates exclusively on a federal program that is the product of Congress's Spending Power. And it upends Congress's selected terms of participation and associated obligations, substituting in Nebraska's own preferred terms. Defendant explicitly contends (at 2) that it is "*federal law* that imposes the mandate to sell drugs to certain healthcare providers at a discounted rate." But, as discussed *infra* at 19-23, no such obligation exists in the very circumstances where L.B. 168 seeks to force manufacturers to provide the federal price. L.B.168 thus impermissibly conflicts with Congress's chosen offer-and-acceptance regime and selected balance for the federal program.

>   1.    The Presumption Regarding Preemption Is Flipped In This Context

Contrary to Defendant's invocation of the presumption against preemption that applies where a state operates in a space of traditional state regulation, the presumption operates in the *opposite* direction in this unique space.

As explained, although a presumption against preemption may apply when it comes to state laws of general applicability (*e.g.*, a requirement that all pharmacies must be licensed), there is no such presumption here. In fact, when a state directly and exclusively targets a federal Spending Power program, and Congress has not specifically given the state a role in defining the contours of that program—here, the 340B statute is silent on any role for the states—the *opposite* presumption applies: Courts presume that the state is acting beyond its authority, and interfering

with the powers of the federal government, when it seeks to interject itself and directly modify a federal program.

L.B. 168 solely, and exclusively, targets 340B-*priced* drugs and manufacturers who participate in the federal 340B program. *See* L.B. 168 §§ 2(1), (2) (defining regulated products (340B-priced drugs) and entities with reference to federal program and the federal pricing obligation imposed under it). And under 340B, "the relationship between" manufacturers and the federal government "is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Buckman*, 531 U.S. at 347. L.B. 168 is accordingly not operating in a space of traditional state power. Instead, it is directly targeting and operating on a federal Spending Power program, created by federal law and governed exclusively by it. As courts have long held, no presumption against preemption applies. *United States v. Locke*, 529 U.S. 89, 108-09 (2000); *Buckman*, 531 U.S. at 347; *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 639-40 (2013) (rejecting contention law fell "within the scope of a State's traditional authority to regulate tort actions" because it "*singles out Medicaid beneficiaries*" (emphasis added)); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 761 (9th Cir. 2022). And, instead, the standard for finding preemption is much lower.

    2.   <u>L.B. 168 Conflicts With 340B By Impermissibly Expanding 340B Obligations</u>

L.B. 168 conflicts with 340B's offer-and-acceptance mechanism and unlawfully expands the scope of the federal subsidy by requiring additional 340B-priced transactions. It thus directly and intentionally "interferes with the methods by which the federal statute was designed to" achieve its purposes, *Int'l Paper*, 479 U.S. at 494, and reworks manufacturers' 340B obligations.

As discussed, *see supra* at 14-17, Congress struck a specific bargain with manufacturers in 340B. *See Novartis*, 102 F.4th at 455. Mindful of the burden imposed by 340B and the need to

ensure continued manufacturer participation in all three programs, Congress deliberately chose to implement manufacturers' core 340B obligation through an "offer" framework that provides manufacturers a measure of control over how they sell 340B-priced drugs and that provides limits on covered entities' right to the federal 340B price.  42 U.S.C. § 256b(a)(1).

*Novartis* establishes that Congress allowed manufacturers the flexibility to set reasonable terms of their 340B "offers" (*e.g.*, delivery terms and other reasonable conditions of purchase) other than the price, and that manufacturers discharge their federal 340B obligation so long as their "offers" to sell at the statutory price remain bona fide and consistent with the federal program. *Novartis*, 102 F.4th at 460-62.  And both *Novartis* and *Sanofi* make clear that the federal statute *does* address distribution and delivery of drugs to contract pharmacies:  Congress's choice of a "shall offer" provision means that, while manufacturers may not be able to bar delivery to *at least one* contract pharmacy for a covered entity that lacks an in-house pharmacy because it could potentially fall short of a genuine "offer" at the reduced 340B price, *Sanofi*, 58 F.4th at 703-04, manufacturers can include conditions limiting the use of multiple contract pharmacies and requiring claims data in their offers, *id.* at 706; *Novartis*, 102 F.4th at 460 ("Statutory silence implies that manufacturers *may* impose distribution conditions by contract[.]").  These decisions also establish that a covered entity has no right to the federal 340B price where it does not accept a reasonable limitation that is part of a bona fide offer on the number of contract pharmacies to which a manufacturer will send 340B-priced drugs or where it will not provide claims data. *Novartis*, 102 F.4th at 459; *Sanofi*, 58 F.4th at 704-06.

Under 340B (as designed by Congress), manufacturers can specify reasonable conditions on their 340B offers, including those related to providing 340B-priced drugs to a single contract pharmacy and requiring claims data.  *Novartis*, 102 F.4th at 460-61 (noting that offer conditions

20

must be acceded to for acceptance and specifying that manufacturers need not "accede to any distribution terms demanded by the offeree"); Compl. ¶¶ 86-93 (explaining as a factual matter that covered entities cannot purchase 340B-priced drugs unless they agree to manufacturers' reasonable conditions). These decisions thus establish (and PhRMA's factual allegations reinforce) that a covered entity has no right to the federal 340B price where it does not accept a limitation on the number of contract pharmacies to which a manufacturer will send 340B-priced drugs or where it will not provide claims data. *Novartis*, 102 F.4th at 459; *Sanofi*, 58 F.4th at 704-06. By outlawing these conditions and applying its law to drugs not actually purchased under 340B, Nebraska vastly expands the number of 340B transactions and unlawfully destroys the offer-acceptance construct Congress mandated. *Astra*, 563 U.S. at 120; *Int'l Paper*, 479 U.S. at 494.

Requiring manufacturers to provide 340B-priced drugs in circumstances where federal law does not poses multiple impermissible and direct conflicts with federal law under well-established precedent of the U.S. Supreme Court. To start, it "interferes with the methods by which the federal statute was designed to" achieve its purposes. *Int'l Paper*, 479 U.S. at 494. Congress chose intentionally to implement 340B through an offer-and-acceptance methodology that allows manufacturers to discharge their 340B obligation by making offers, including those that impose conditions limiting contract pharmacy use. Disputes about the sufficiency of a federal offer are meant to be addressed by HHS and the federal courts interpreting federal law. 42 U.S.C. § 256b(d)(3); 89 Fed. Reg. 28,643, 28,657 (Apr. 19, 2024). L.B. 168 nonetheless compels manufacturers to provide 340B-priced drugs to contract pharmacies by dictating the contours of their offers, overruling the determinations of HHS and the federal courts about what is permissible in such a federal offer. But states cannot overrule the mechanisms Congress has put in place to implement its federal program. *Int'l Paper*, 479 U.S. at 494; *see also Crosby*, 530 U.S. at 373

(explaining that a state may not adopt another "mechanism" to implement or enforce federal law, on top of Congress's chosen federal mechanism); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103-05 (1992) (holding that non-conflicting state laws promoting worker safety were preempted by federal safety statute because they interfered with Congress's chosen method of regulation); *Wis. Dep't of Indus., Labor, & Human Rels. v. Gould Inc.*, 475 U.S. 282, 286-87 (1986) (holding state law preempted where it conflicted with the technique chosen by Congress in federal law to accomplish objective); *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996) (state statute conflict preempted where it prohibited banks from selling insurance while Congress permitted them to do so); *Franklin Nat'l Bank of Franklin Square v. New York*, 347 U.S. 373, 375-79 (1954) (similar).

And by compelling transactions at the 340B price that would not otherwise occur under federal law, L.B. 168 expands the scope of manufacturers' 340B obligations and fundamentally alters the bargain struck by Congress with manufacturers for participation in 340B, Medicare, and Medicaid.  Without L.B. 168, there would be no sale at the 340B price in circumstances that violate a contract-pharmacy or claims-data condition.  Compl. ¶¶ 86-93.  With L.B. 168, however, a purchase at the 340B price *would* occur:  L.B. 168 bars manufacturers from imposing a federally lawful condition, and, as a result, covered entities can accept the resulting offer without that condition.

L.B. 168 thus explicitly regulates drug pricing and forces manufacturers to sell 340B-priced drugs in transactions that, under federal law, *would have never taken place*—expanding the scope of their 340B obligation and burden.  That, too, renders L.B. 168 preempted.  *See Int'l Paper*, 479 U.S. at 494 (finding state law preempted because it "upset[] the balance of public and private interests so carefully addressed by the [federal statute]"); *Forest Park II*, 336 F.3d at 730, 732-33

(holding, where Congress enacts a program that relies on participation by private parties via incentives and sets those parties' obligations, additional state obligations conflict); *see also Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 531 (5th Cir. 2013) (laws that "interfere[] with the careful balance struck by Congress" are conflict preempted).  PhRMA has sufficiently pled that Nebraska's reworking of the requirements of a federal program it had no role in creating and has no role in administering is forbidden by the Supremacy Clause.[3]  Because L.B. 168 compels manufacturers to provide 340B-*priced* drugs in circumstances where federal law does not, it is preempted.

### 3.    Defendant's Counterarguments Fail

Defendant advances three primary counterarguments for their view that the Complaint fails to state a claim, none of which work.

*First*, Defendant leans heavily on *McClain*, which found that an Arkansas law that regulated contract pharmacy limitations was not field preempted and did not conflict with 340B's *closed system* which prohibits diversion of 340B-priced drugs to non-covered entities.  95 F.4th 1136, 1143-45 (8th Cir. 2024).  But *McClain* did not address Congress's offer-and-acceptance framework as identified in *Novartis,* or *Novartis*'s holding that one-contract-pharmacy and claims-data conditions are specifically permissible.  To the extent *McClain* had anything to say that bears on PhRMA's current argument that L.B. 168 compels additional sales to occur at the 340B price, as detailed below, *McClain* supports PhRMA.

There is a good reason *McClain* did not address any conflict with the federal offer-and-acceptance framework:  It was issued *before Novartis*.  The later-in-time *Novartis* decision

---

[3] Nebraska understandably does not claim that L.B. 168 is intended to operate as some sort of independent state law price-control regime, which would raise entirely different constitutional problems.

definitively construed and clarified manufacturers' obligations to "offer" 340B priced drugs under the federal statute and overturned the pre-*Novartis* federal regulatory regime under which *McClain* was decided.  Before *Novartis*, HHS had adopted essentially the same position as L.B. 168 and *McClain*:  That 340B imposes a "delivery" obligation to provide drugs to "an unlimited number of contract pharmacies."  *Novartis*, 102 F.4th at 459.  So there was no occasion for *McClain* to consider any specific "conflict" with the federal offer-and-acceptance regime, and no such argument was raised or ruled upon in that case.[4]  *See Gonzalez-Vega v. Lynch*, 839 F.3d 738, 740-41 (8th Cir. 2016) (holding that prior decision was not binding as to specific argument regarding effect of new case where prior decision had not addressed the new case's effect).

After *McClain* was decided, *Novartis* subsequently held that HHS's administrative construction violated the 340B statute.  *Id.* at 460-64.  *Novartis* explained that the proper inquiry focuses on 340B's explicit instructions regarding the scope of the federal obligation.  Specifically, a manufacturer must only "offer" a drug at the 340B reduced price, which "merely requires manufacturers to *propose* to sell covered drugs to covered entities at or below a specified monetary amount."  As *Novartis* clarified, that is the proper lens through which to evaluate the permissibility of manufacturer conditions, including contract pharmacy restrictions.  *Id.* at 460-61 (emphasis added).  So the statute's silence did not leave a gap for HHS—much less the 50 states—to fill by *imposing* other obligations:  Rather, "this silence preserves … the ability of sellers to impose *at least some delivery conditions*" so long as the offer to sell at the 340B-mandated price remains

---

[4] Eighth Circuit precedent establishes that an opinion should not be construed to resolve issues that were not "raised by the parties nor discussed by the panel."  *Streu v. Dormire*, 557 F.3d 960, 964-65 (8th Cir. 2009) (collecting cases from the Eighth Circuit and Supreme Court); *United States v. Bruguier*, 735 F.3d 754, 762-63 (8th Cir. 2013) (stating it is "axiomatic" that decisions provide "absolutely no support" in such circumstances); *Waters v. Churchill*, 511 U.S. 661, 678 (1994) ("[C]ases cannot be read as foreclosing an argument they never dealt with.").

bona fide. *Id.* at 460 (emphasis added). That includes conditions on the number of contract pharmacies to which drugs are provided. *Id.* at 463-64; *Astra*, 563 U.S. at 119-20.

The upshot is that prior to *Novartis*, it was not completely clear that state laws compelling unlimited delivery to contract pharmacies resulted in more 340B transactions than would otherwise occur under federal law by upending the offer-and-acceptance framework. *See McClain*, 95 F.4th at 1145 (finding that Arkansas law "assists" with the "purpose" of 340B). By contrast, *McClain* itself accepted that a state law *would be* preempted if it attempted to "set or enforce discount pricing" where federal law did not do so. *Id.* **That is exactly what L.B. 168 is alleged to do here**: After *Novartis*, there is no question that federal law allows a manufacturer to include conditions on the number of contract pharmacies the manufacturer will provide drugs to, contrary to HHS's historical-but-now-unlawful guidance. *Novartis*, 102 F.4th at 459. Now that federal law clearly *does not* require sales of 340B-priced drugs when a purchaser *rejects* the manufacturer's offered contract-pharmacy conditions, the consequence is that L.B. 168 compels transactions at the 340B price that the federal 340B statute *does* not compel at the 340B price.

Nor did *McClain* substantively address *Astra*, which makes clear that administration and enforcement of 340B is solely committed to the federal government, superintended by federal courts, *Astra*, 563 U.S. at 119-20, or evidence that covered entities and contract pharmacies are violating anti-diversion guidance on title and agency requirements, *see supra* at 9.

*Second*, Defendant contends that L.B. 168 is simply a supplemental state law that is merely about delivery and forbidding manufacturers from "deter[ring] or interfer[ing] with … distribution relationships" between covered entities and contract pharmacies. Mot. to Dismiss at 3, 25. That

25

contention is clearly rebutted by the text of L.B. 168 itself *and* how 340B operates.[5]

To begin, L.B. 168 explicitly goes beyond "delivery," preventing manufacturers from "directly or indirectly, deny[ing], restrict[ing], or prohibit[ing] the ***acquisition*** of ***any 340B drug***." L.B. 168 § 3(1) (emphasis added).  In any event, as pled in PhRMA's Complaint ¶¶ 86-93, there is no qualifying 340B purchase to which Nebraska could attach a delivery obligation if a covered entity does not accept a manufacturer's conditions.  In other words, if the buyer does not accept those conditions when attempting to place a 340B order, *there is no order placed and no 340B purchase to which a delivery obligation could be attached.*  That gives lie to Nebraska's theory.

Moreover, Nebraska does not contest that the same drugs that would be subject to L.B. 168 are already available in Nebraska for purchase and delivery at commercial or negotiated non-340B prices at the same pharmacies.  In other words, the relevant drugs are already being delivered to Nebraska pharmacies, just not at 340B prices.  Compl. ¶ 90.  Indeed, as the *Morrisey* court explained, drugs are already available to contract pharmacies, so the only question is the price contract pharmacies pay for such drugs.  760 F. Supp. 3d at 455-56.  And a violation of state law is incurred "not by withholding drugs from contract pharmacies, but by refusing the 340B discount when delivering its drugs to those pharmacies."  *Id.* at 456.  As a result, laws like L.B. 168 are about "delivery *at a given price*, not delivery *per se*" and boil down to a question of federal

---

[5] A statute's intended operation and effect is what controls the preemption analysis: "A State may not evade the pre-emptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect."  *Wos*, 568 U.S. at 636; *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 463-64 (2012) (concluding that, where federal law preempted state regulation of slaughterhouses' "front-end" procedures for inspecting, handling, and slaughtering livestock, state could not escape preemption by regulating the back-end sale of meat from livestock that was not raised in accordance with state regulation); *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004) (similar); *United States v. Alabama*, 691 F.3d 1269, 1295-96 (11th Cir. 2012) (rejecting state's attempt regulate immigration "under the guise of contract law").

pricing—not delivery.  *Id.* at 455; L.B. 168 §§ 2(1) (defining "340B drug" with reference to the federal price).

Even if L.B. 168 were simply a delivery regulation (it is not), it would still fall within the bounds of the federal exclusive enforcement regime.  *Novartis* itself makes clear that policies regarding providing 340B-priced drugs to contract pharmacies fall within the federal regulated space (*specifically including the regulation of federal offers under 42 U.S.C. § 256b(a)(1)*).  Offers with one-contract-pharmacy limitations and claims-data preconditions do not run afoul of the federal statute.  102 F.4th at 462-64.

*Third*, Defendant contends (at 24) that L.B. 168 does not pose an obstacle under conflict preemption principles because it does not "frustrate[] Congress's safeguards against diversion." But that relates to a different manufacturer's—AbbVie's—argument regarding obstacle preemption, not PhRMA's.  As PhRMA pled (at Compl. ¶¶ 2-8, 127-130), Congress struck a bargain with manufacturers regarding the scope of the 340B federally-mandated, privately-funded subsidy they would be required to provide for participating in the federal program.  L.B. 168 unlawfully upends that.

### B.    L.B. 168's Regulation Of 340B Claims Data Is Also Preempted Because It Interferes With The Federal Enforcement Regime

PhRMA has also sufficiently pled that L.B. 168's limitations on manufacturers' gathering of information are preempted.

L.B. 168 restricts the collection of claims data.  L.B. 168 § 3(2).  But, as discussed, manufacturers are permitted under federal law to impose these conditions on their offers, and Nebraska's prohibition of such conditions skews the balance Congress struck.  *Supra* at 19-23. And the prohibition imposes other direct conflicts given that it stands as an obstacle to the federal system's enforcement scheme, which is predicated on manufacturers' ability to access claims data,

and would limit manufacturers' ability to utilize what is known as a rebate model to provide the 340B price, a mechanism explicitly contemplated under the federal statute. *See Morrisey*, 760 F. Supp. 3d at 450-53 (holding similar state law that barred collection of claims data preempted because it conflicted with manufacturers' 340B audit rights and federal enforcement regime); *Eli Lilly & Co. v. Kennedy*, No. 24-cv-3220, 2025 WL 1423630, at \*13 (D.D.C. May 15, 2025) (affirming manufacturers' right to "impose data-reporting conditions on covered entities" and explaining why claims data is important to program integrity); 90 Fed. Reg. at 36,163.

Under the federal regime, a manufacturer must first audit a covered entity before initiating ADR. *See* 42 U.S.C. § 256b(a)(5)(C), (d)(3)(B)(iv). Audits, in turn, are conducted "in accordance with procedures established by the Secretary relating to the number, duration, and scope." *Id.* § 256b(a)(5)(C). HHS has specified manufacturers are only permitted to conduct an audit where they can identify "documentation" that will "demonstrate ... that there is 'reasonable cause,' supported by 'sufficient facts and evidence.'" *Eli Lilly*, 2025 WL 1423630, at \*2 (quoting 61 Fed. Reg. 65,406, 65,409-10 (Dec. 12, 1996)). So, manufacturers *only* may conduct an audit where they "ha[ve] documentation which indicates there is reasonable cause." 61 Fed. Reg. at 65,409; *see also Novartis Pharm. Corp. v. Espinosa*, No. 21-cv-1479, 2021 WL 5161783, at \*8 (D.D.C. Nov. 5, 2021) (explaining manufacturer "convincingly argues that the claims data conditions ... will enable it to better utilize the anti-fraud audit and ADR procedures that Congress established for manufacturers in Section 340B").[6]

---

[6] *See also* CMS, Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Section 1191–1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027, at 230 (Oct. 2, 2024) (to dispute any IRA duplicate inflation rebate with CMS, manufacturers must "provide *documentation* [to CMS] demonstrating the claim was 340B-eligible." (emphasis added)), https://tinyurl.com/3sx8hmah.

Claims data *is this very "documentation"* that is essential to access the federal audit process. Because these manufacturer audits focus principally on "duplicate discounts" and diversion, 42 U.S.C. § 256b(a)(5), detailed information is required. To audit for "duplicate discounts," a manufacturer must have sufficient information regarding what prescriptions are at issue—to demonstrate with documentation that there is duplication. 61 Fed. Reg. at 65,409-10; *Eli Lilly*, 2025 WL 1423630, at *13. The same is true for "diversion"—a manufacturer must know what prescriptions the covered entity believes qualify for the 340B price. Manufacturers' policies to collect such data are in line with "business practices" more generally and collect "standard information." *Novartis*, 102 F.4th at 463 (claims data is in line with "business practices" and "standard information"); *Morrisey*, 760 F. Supp. 3d at 451 (noting the collection of such data is a "widespread industry practice").

Yet L.B. 168 hides this information, limiting manufacturers' access to evidence of federal violations and handicapping manufacturers' use of the exclusive federal resolution process. *See Eli Lilly*, 2025 WL 1423630, at *13. This creates a direct conflict with the federal regime. As the *Morrisey* court stated: "By restricting the very method by which data collection is made, [the state statute] frustrates drug manufacturers' ability to take the initial steps necessary to start the very audit required to access" ADR and thus "stands as an obstacle to achieving the federal objective of preventing fraud in" 340B. 760 F. Supp. 3d at 453.

The inability to access claims data is not just a problem for 340B. Under the new IRA Medicare Drug Price Negotiation Program, HHS is to "negotiate" with manufacturers the "maximum fair price[s]" for certain drugs. 42 U.S.C. § 1320f-3(a). Manufacturers must provide access to selected drugs at the so-called maximum fair prices, except when such selected drugs are 340B-eligible and the 340B price is lower. *Id.* § 1320f-2(d). To avoid duplicating price reductions,

this scheme requires identifying when a specific drug is acquired at the 340B price, a burden CMS places on manufacturers.  *See* CMS, Medicare Drug Pricing Negotiation Final Guidance 57-58, 60 (Oct. 2, 2024), https://tinyurl.com/3sx8hmah.  As a result, manufacturers require claims data to avoid providing duplicative price reductions.

Recently, certain manufacturers have sought to use what is called the "rebate model," under which they would collect claims data and then provide the 340B price through rebates rather than as upfront discounts—to allow compliance with the IRA.  *See* 90 Fed. Reg. at 36,163.  In August, HHS announced that it is establishing a Rebate Model Pilot Program for certain manufacturers (including some of PhRMA's members) to offer the 340B price via rebates.  *Id.*; Compl. ¶¶ 111-12.  In addition to expressly recognizing the use of rebates for qualifying manufacturers, the announcement also makes clear that participating manufacturers can demand certain claims data as part of their rebate models.  90 Fed. Reg. at 36,164.  This data includes information like the date of service, date of prescribing, national drug code, prescriber and service provider ID, and 340B ID, among other things.  *Id.* at 36, 165.  As HHS explained, the collection of this data is aimed at preventing duplicate discounts between 340B and the IRA.  *Id.* at 36,163-64.  But L.B. 168 now hides that data that the federal Rebate Model Pilot Program expressly permits and requires for implementation.  In short, L.B. 168, by barring claims-data-collection conditions, seeks to ban the federal government's Rebate Model Pilot Program.  This is yet another sharp, irreconcilable conflict between state and federal law.

Nebraska's attempt to prohibit requirements to exchange of industry-standard claims data required to prevent 340B abuses stands in stark contrast to other courts' recognition of the conflict posed between claims-data restrictions and federal law, *see PhRMA v. Fitch*, No. 1:24-cv-160, 2024 WL 3277365, at *10 (S.D. Miss. July 1, 2024), as well other states' expressly disclaiming of

30

any attempt to restrict manufacturers' claims-data policies.[7]

Defendant advances two incorrect counterarguments in response.  First, Defendant asserts (at 26) that "L.B. 168 does not prohibit manufacturers from obtaining data necessary to comply with federal law" and so the law "allows manufacturers to adopt policies that require covered entities to provide any data necessary to comply with federal law."  But that is a non sequitur and fails to address the interference L.B. 168 creates with manufacturers' ability to access data they require to even know when abuse could be occurring that would warrant an audit—much less to obtain an audit.

Second, Defendant claims (at 26) that L.B. 168's restriction does not "actually conflict" because it "only prohibits manufacturers from conditioning *receipt* of a 340B drug on the provision of data" and so manufacturers can (according to Defendant) still collect or demand data.  But Defendant identifies no viable alternative means of obtaining claims-data information.  As PhRMA pled, covered entity groups have long expressed hostility to sharing claims data.  Compl. ¶ 139.  Nebraska's position would mean that "covered entities—who may be engaging in the kind of fraud that the 340B Program's alternative dispute system is meant to prevent—will essentially be the ones determining whether or not they wish to give manufacturers" data.  *Morrisey*, 760 F. Supp. 3d at 453.  This would be equivalent to "the fox guard[ing] the hen house."  *Id.*; *Eli Lilly*, 2025 WL 1423630, at *13-14 (discussing importance of claims data).

---

[7] *See* Br. for Miss. at 31-32, *PhRMA v. Fitch*, No. 24-60340 (5th Cir. Nov. 8, 2024) ("Section 340B entitles drug makers to claims data.  HB 728 honors that entitlement."), ECF No. 40; Br. for Vt. at 12-14, *PhRMA v. Arel*, No. 1:25-cv-00600 (D. Vt. Sept. 2, 2025) (not opposing entry of preliminary injunction as to Vermont's restriction on rebate models, which include per HHS's program the collection of claims data), ECF No. 22; Br. for Md. at 29, *PhRMA v. Brown*, No. 1:24-cv-01631 (D. Md. July 2, 2024), ECF No. 19-1; *see also* Hawaii H.B. 712 Sec. 2, § 2(b) (exemption for claims data used to detect 340B violations).

### C.      L.B. 168 Conflicts With 340B's Enforcement Mechanism

Finally, L.B. 168 directly conflicts with the federal enforcement regime.  *See Astra*, 563 U.S. at 113; *Buckman*, 531 U.S. at 349-50 (where agency had "a variety of enforcement options that allow it to make a measured response," greenlighting state-law tort claims would "inevitably conflict with the [agency's] responsibility to police fraud consistently with [its] judgment and objectives"); *Morrisey*, 760 F. Supp. 3d at 457 ("If private attempts to enforce the 340B Program go against 'what Congress contemplated when it centralized enforcement in the [federal] government,' then so too would public attempts to enforce it."); 42 U.S.C. § 256b(d)(1)(B)(i)(IV), (ii) (anticipating iterative process between manufacturers and Secretary regarding violations).

Like the claims in *Astra*, L.B. 168 conflicts with the federal enforcement regime by usurping HHS's unitary enforcement authority.  *Morrisey*, 760 F. Supp. 3d at 457.   Federal regulations make clear HHS's view that it has authority to address the issues L.B. 168 targets.  *See* 89 Fed. Reg. at 28,649 (defining overcharge claim, to be brought via ADR, to encompass "a claim that a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price or the manufacturer does not offer the 340B ceiling price"); Compl. ¶ 107.  And the federal government has explained that "*Astra* left no doubt that 'Congress directed HHS to create [ADR]' in order 'to make [ADR] the proper remedy for covered entities' complaining of 340B violations," specifically "dispute[s] over contract-pharmacy restrictions." Gov. Reply Br. at 5.  Yet Nebraska seeks to address the very same disputes, contra to *Astra*. *Morrisey*, 760 F. Supp. 3d at 453-59.

A preview of potential state enforcement proceedings underscores the conflict.  In any state proceeding, a manufacturer will assert federal defenses, including that the specific prescriptions subject to enforcement are not qualified under federal law for a 340B price.  This is an essential threshold issue Nebraska cannot avoid, and requires adjudication of multiple questions of federal

law, including whether: (1) the prescriptions are actually written for qualifying 340B patients, under the federal definition of "340B patient," *Eli Lilly*, 2025 WL 1423630, at *2; (2) the prescriptions illegally duplicate Medicaid rebates already given, 42 U.S.C. 256b(a)(5)(A); (3) the contract pharmacy that dispenses the 340B-priced drugs had the requisite "agency" relationship to avoid violating the federal diversion requirements; (4) the covered entity retained title to the 340B-priced drugs in order to avoid federal diversion; and/or (5) a combination of these violations under federal law disqualifies the covered entity from participation in 340B, *Astra*, 563 U.S. at 120.

Permitting state intervention would allow 50 states to destroy the federal government's unified control over 340B. *Arizona v. United States*, 567 U.S. 387, 406 (2012); *Gould*, 475 U.S. at 286 ("[C]onflict is imminent whenever two separate remedies are brought to bear on the same activity."). That is precisely what the *Morrisey* court (the first court to seriously contend with *Astra* in litigation over state contract pharmacy laws) concluded, recognizing *Astra* controlled. 760 F. Supp. 3d at 458. The Supremacy Clause does not permit Nebraska to adopt a scheme that eviscerates the uniformity Congress intended and upsets the bargain Congress set for a federal benefits program. *Buckman*, 531 U.S. at 350. With many states enforcing their own visions of 340B, the uniformity central to 340B's administration will be shattered and the federal government will lose its control. *See City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 639 (1973) (recognizing danger of "fractionalized control").

## II.     L.B. 168 IS FIELD PREEMPTED

PhRMA has sufficiently pled that L.B. 168, which invades the bounds of an exclusively federal program, is field preempted. *See Crosby*, 530 U.S. at 372 n.6 (noting the "categories of preemption are not 'rigidly distinct'"). PhRMA has also sufficiently pled a field preemption claim based on L.B. 168's invasion of a unique federal field—340B eligibility. The federal statute addresses precisely: (1) which entities can be eligible for 340B reduced prices, 42 U.S.C.

§ 256b(a)(2); (2) which prescriptions are and are not eligible for price reductions, *id.* § 256b(a)(5); (3) under which circumstances drug manufacturers must offer 340B drug pricing, and what conditions those offers may and may not include through the bona fide offer requirement, *id.* § 256b(a)(1); and (4) a highly detailed set of iterative enforcement measures to address issues that arise under the program, *id.* § 256b(d); *see Novartis*, 102 F.4th at 460-64 (explaining how delivery to contract pharmacies is addressed under Section (a)(1) of the federal statute).  At no point in the federal statute did Congress provide states any authority to implement, much less modify, any of the requirements of the 340B program.  Unlike other joint federal-state programs like Medicaid, 340B is not an exercise in cooperative federalism.

In particular, the field governed by this federal program is defined by its specific provisions governing each of its key functions, including: eligibility for reduced pricing, the content of a drug manufacturer's 340B bona fide, and the administration and enforcement of the statute's requirements.  *See supra* at 7-8.  Field preemption applies where a state law "diminish[es] the [federal government]'s control over enforcement and detract[s] from the integrated scheme of regulation created by Congress."  *Arizona*, 567 U.S. at 402.  And this field specifically covers how the federal program addresses contract pharmacies.  *See Novartis*, 102 F.4th 460-64 (explaining in detail how the "shall offer" provisions of Section (a)(1) address bona fide offers relating to contract pharmacies); 61 Fed. Reg. at 43,550, 43,555 (explaining how contract pharmacy issues are addressed under the federal diversion restrictions).

Defendant has no real answer to that, instead relying on *McClain*.  But *McClain* does not answer the question regarding field preemption before this Court.  Defendant concedes (at 3) that L.B. 168 exclusively and solely targets a federal spending program:  "Nebraska's law functions only in tandem with the federal scheme; it imposes obligations only on 340B participants."  And

in Defendant's own words:  "If ever Plaintiffs desire to relieve themselves of the obligations that flow from L.B. 168, they can do so by ceasing their participation in 340B."  Mot. to Dismiss at 14. In other words, L.B. 168 is not a law of general applicability, it is explicitly and solely targeted at a federal program and the terms of participation in that federal program.  Given that conceded exclusive targeting of a federal spending program, the presumption against preemption that *McClain* applied and relied upon is inapposite here.  *See supra* at 18-19.

The Eighth Circuit's decision in *Bell v. Blue Cross & Blue Shield of Oklahoma*, 823 F.3d 1198 (8th Cir. 2016), where the Eighth Circuit declined to apply the presumption is analogous. There, the court considered whether an Arkansas law related to "health care" should receive the benefit of the presumption.  *Id.* at 1201.  The court recognized that "health care in general" was an area of traditional state regulation.  *Id.*  But it nonetheless refused to apply the presumption because the dispute "concern[ed] benefits from a federal health insurance plan for federal employees that arise from a federal law."  *Id.* at 1201-02 (holding that the case "involve[d] federal interests comparable to those involved in *Buckman* and *Locke*").  The same is true here:  This dispute involves the scope of a federal benefit (340B pricing) for enumerated beneficiaries (covered entities) under a federal program (340B) that arises from federal law (the 340B statute).  As in *Bell*, no presumption should apply here.

Even setting aside that dispositive difference, there are yet other reasons *McClain* does not control here.  As discussed *supra* at 23-25, the *McClain* court did not have the benefit of the D.C. Circuit's decision in *Novartis* when it ruled, and did not address *Novartis*'s holding that one-contract-pharmacy limitations and claims-data conditions are permissible in a federal offer under Section (a)(1).  Moreover, *McClain* was a summary judgment decision that rested on two erroneous factual assumptions (urged by intervenors in that case):  that title to 340B-priced drugs

remained with covered entities and that contract pharmacies acted as agents of covered entities. Those assumptions are directly contradicted by the factual allegations here.[8] These factual contentions were advanced by the intervenor covered entities in *McClain* and accepted by the court as a cornerstone of its decision. *See* Br. for Intervenors-Appellees, *McClain*, No. 22-3675 (8th Cir. Apr. 10, 2023); *see also McClain*, 95 F.4th at 1142-45. While those factual findings were unjustified based on the record in *McClain*, they have absolutely no bearing here at the motion to dismiss stage. PhRMA has alleged that contract pharmacies hold title to the drugs, *not* covered entities, a fact buttressed by public records. Compl. ¶ 69. PhRMA has also alleged that a principal-agent relationship does not routinely exist. *Id.* ¶¶ 69-70. The *McClain* court's reliance on erroneous factual premises, which are contradicted by the Complaint's allegations (and facts in the public record), render it inapposite.

Claim III is adequately pled.

## III. PHRMA HAS SUFFICIENTLY PLED ITS EXTRATERRITORIAL REGULATION CLAIM

PhRMA sufficiently pled that L.B. 168 impermissibly regulates extraterritorial conduct.

Since ratification of our Nation's Constitution, the states have been governed by a fundamental principle: no state can regulate conduct outside its boundaries in the territory of its sister states. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003). This principle flows both from the Constitution's Commerce Clause, which gives our federal government responsibility for regulating commerce among the states, and from several other Constitutional provisions defining the role of states within our Republic. U.S. Const. art. I, § 8, cl. 3; *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374, 376 n.1 (2023); *Accessible Meds.*,

---

[8] Issues of title and agency are significant because, among other things, contract pharmacies are not statutorily entitled to receive 340B-priced drugs and covered entities are barred from transferring or selling 340B-priced drugs to anyone other than their patients. *See supra* at 8.

140 F.4th 957, 959.

L.B. 168 violates these principles. Among the ways that a state can violate the dormant Commerce Clause is by enacting a law that "ha[s] the practical effect of extraterritorial control on interstate commerce." *Accessible Meds.*, 140 F.4th at 960 (quoting *Styczinski v. Arnold*, 46 F.4th 907, 912 (8th Cir. 2022)). A state thus "has no power to project its legislation into another state by regulating the price to be paid *in that state*." *Id.* (quoting *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003)) (emphasis added). And more broadly, the dormant Commerce Clause forbids a state from "*directly* regulat[ing] transactions which take place wholly outside the State." *Id.* (quoting *Pork Producers*, 598 U.S. at 376 n.1).

Just months ago, the Eighth Circuit applied these same principles to hold that states cannot regulate transactions between drug manufacturers and distributors outside their borders, even if the manufacturers and distributors are licensed in the state, and even if the drugs are ultimately sold to consumers within the state. *Id.* at 959-61. That case involved a Minnesota law prohibiting manufacturers from "impos[ing], or caus[ing] to be imposed, an excessive price increase … on the sale of any generic or off-patent drug sold, dispensed, or delivered to any consumer in the state." *Id.* at 959 (quoting Minn. Stat. § 62J.842 subd. 1). Minnesota sought to defend its statute by arguing that it applied only to drugs ultimately sold to consumers in Minnesota. *Id.* at 960. But the court focused on the location of the transaction that would subject the manufacturer to liability: the manufacturer's sale to the distributor. *Id.* at 959-60. Because "a Colorado manufacturer would be penalized if it sold drugs to a New Jersey distributor at prices above those proscribed by the Act," the law violated the dormant Commerce Clause for two separate reasons: it had "the specific impermissible extraterritorial effect of controlling prices outside of Minnesota" and it "*directly* regulate[d] transactions which take place wholly outside the State." *Id.* at 960-61. That the drugs

37

later "ended up in Minnesota" was irrelevant. *See id.* at 959-60.

The same is true of L.B. 168 in light of PhRMA's factual allegations, which Defendant fails to address. As PhRMA pled in its Complaint, PhRMA's members sell their drugs—including drugs ultimately sold at 340B prices—to distributors. Compl. ¶¶ 159-67. Both PhRMA's members and the main distributors to which they sell are all located outside of Nebraska. *Id.* Pharmacies and healthcare providers then purchase PhRMA's members' drugs from these out-of-state distributors. *Id.* Here, the manufacturer conduct that allegedly violates L.B. 168 is charging distributors commercial prices that exceed the 340B prices and refusing chargebacks for distributor sales in non-340B compliant transactions. The law, then, seeks to compel manufacturers to lower their prices to distributors or issue chargebacks for sales that violated their contract pharmacy policies. This is no less price control than forbidding an "excessive price increase" in *Accessible Medicines*, 140 F.4th at 960.

And as in *Accessible Medicines*, the prohibited manufacturer conduct here occurs in the transaction between the manufacturer and distributor, by barring the circumstances under which manufacturers provide the 340B price. This case is, in all relevant respects, indistinguishable from *Accessible Medicines*. By regulating this out-of-state transaction and forcing many more transactions at the 340B price than otherwise required, L.B. 168 violates the dormant Commerce Clause. *See also Styczinski v Arnold*, 46 F.4th 907 (8th Cir. 2022) (similar); *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 666-71 (4th Cir. 2018) (invalidating drug-pricing law that regulated "the price of transactions" occurring outside state).

At this stage, PhRMA's allegations regarding L.B. 168's impact on out-of-state manufacturers and out-of-state transactions are sufficient. *See Pharm. Rsch. & Mfrs. of Am. v. Bailey*, No. 24-cv-04144, 2025 WL 644281, at *6 (W.D. Mo. Feb. 27, 2025) (denying motion to

dismiss on these grounds).

## CONCLUSION

For the foregoing reasons, PhRMA respectfully requests that Defendant's motion to dismiss be denied. If the Court grants the motion, PhRMA respectfully requests leave to amend.

Dated: September 19, 2025

Respectfully submitted,

*/s/ Philip J. Perry*
Philip J. Perry (*pro hac vice*)
Andrew D. Prins
Abid R. Qureshi (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
philip.perry@lw.com

and

Alexander S. Arkfeld, #27277
Daniel J. Gutman, #26039
GUTMAN LAW GROUP
P.O. Box 485
Omaha, Nebraska 68101
(402) 570-8836
alex@glg.law
daniel@glg.law

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the word count of this brief complies with local rule NECivR 7.1(d).  The word-count function of Microsoft Word, version 2507, states that this brief, inclusive of all text (including the caption, heading, footnotes, and quotations), contains 12,317 words.  No generative artificial intelligence was used in drafting this brief.

*Philip J. Perry*
Philip J. Perry

**CERTIFICATE OF SERVICE**

I hereby certify that on September 19, 2025, I electronically filed the foregoing Plaintiff's

Brief in Opposition to Defendant's Motion to Dismiss with the Clerk of Court using the CM/ECF

system. I certify that all participants in the case are registered CM/ECF users and that service will

be accomplished by the CM/ECF system.

*Philip J. Perry*
Philip J. Perry